UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/28/2023
```

------------------------------------------------------------------------X
                                      :

SELECT HARVEST USA LLC,            :

                   Plaintiff,      :

                                        :            22-cv-3931 (LJL)

     -v-                       :

                                        :        <u>OPINION AND ORDER</u>

INDIAN OVERSEAS BANK,          :

                                        :

                   Defendant.     :

                                        :

------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Select Harvest USA LLC ("Plaintiff" or "Select Harvest") moves, pursuant to Federal Rule of Civil Procedure 55(b), for default judgment against defendant Indian Overseas Bank ("Defendant" or "IOB"), Dkt. No. 16, and Defendant moves, pursuant to Federal Rule of Civil Procedure 55(c), to vacate the Clerk's entry of default, Dkt. No. 22.[1]  For the following reasons, Plaintiff's motion for default judgment is denied and Defendant's motion to set aside the default is granted.

**BACKGROUND**

      The following facts are taken from the submission of the parties.  Select Harvest entered into twelve contracts to sell fifty-eight loads of almonds for $4,186,519.77 to Agson Global Pvt. Ltd ("Agson"), a company existing under the laws of India.  Dkt. No. 17 ("Greenwald Decl.") ¶ 8.  The contracts called for payment by "net cash against documents, presentation buyer bank"

---

[1] Defendant also moves, pursuant to Federal Rule of Civil Procedure 12(b)(2), to dismiss this action for lack of jurisdiction.  Dkt. No. 21.  Defendant's motion to dismiss is denied without prejudice.

or "documents against payment."  *See* Dkt. Nos. 17-9–17-20 (cleaned up); *see also* Dkt. No. 17-5 (instructing IOB that the terms of payment for one load were "Documents Against Payment").

"Documents against payment" transactions are a documentary collection, which are used to facilitate international commerce in goods by mitigating counterparty risk.  *See* Dkt. No. 25 at 3; 1 Alan S. Gutterman, *Corporate Counsel's Guide to Strategic Alliances* § 4:23 (Dec. 2022) (hereinafter, "Guide to Strategic Alliances").  In cash against document collection transactions, each party appoints a bank to act on its behalf; the exporter appoints a "remitting bank" while the importer appoints a "collecting bank."  *See* Uniform Rules for Collection, International Chamber of Commerce Publication No. 522 ("URC 522"), Art. 3.  The exporter sends goods to a location designated by contract.  *See* 1 Alan S. Gutterman and Robert L. Brown, *Going Global: A Guide to Building an International Business* § 11:6 (2022–2023 ed.) (hereinafter, "Going Global").  The seller also presents the required documents (including bills of lading, invoices, and certificates of origin) to the remitting bank, who forwards the documents to the collecting bank.  *Id.*  The goods are held by customs and the shipper until the required documents are presented by the collecting bank, which can only be released once the collecting bank has received payment from the buyer.  *Id.*; 1 Guide to Strategic Alliances § 4:23.  In this way, the parties solve some of the risks inherent in cross-border transactions—the seller gains assurances that payment will be made before the buyer takes possession and the buyer need not make payment and take possession until she has inspected the goods in her home country.  *See* 1 Going Global § 11:6 ("[I]n essence, the goods remain in escrow until payment has been made.").

Select Harvest appointed Wells Fargo Bank, N.A. ("Wells Fargo") as its remitting bank, and Agson appointed IOB as its collecting bank.  Dkt. No. 1 ¶ 16.  Between April and July 2021, Wells Fargo sent IOB collection instructions with the required documents, including the original

bills of lading, certificates of origin, and phytosanitary certificates. Greenwald Decl. ¶ 8. Based on the evidence submitted to the Court, Wells Fargo appears to have sent separate collection instructions to IOB for each of the fifty-eight orders. *See* Dkt. No. 17-5 at ECF p. 1 (noting that the collection instructions were for order number 2956.010 only). The instructions indicated that the collection was "subject to the Uniform Rules for Collection, International Chamber of Commerce Publication No. 522." *See id.*

URC 522 is a set of rules promulgated by the International Chamber of Commerce that specifies certain duties for parties to a documentary collection. URC 522, Preface. URC 522 is not independently binding international law; it only applies if its rules are incorporated into the collection instructions. URC 522, Art. 1; *see also Inox Wares Pvt. Ltd. v. Interchange Bank*, 2008 WL 4691906, at *4 (D.N.J. Oct. 22, 2008) (stating that a collecting bank becomes bound by URC 522 if it agrees to handle a collection that incorporates URC 522). URC 522 places the burden on the collecting bank to reject obligations imposed by the transmittal of collecting instructions. *See* URC 522, Art. 1(c) ("If a bank elects, for any reason, not to handle a collection or any related instructions received by it, it must advise the party from whom it received the collection or the instructions by telecommunication or, if that is not possible, by other expeditious means, without delay."). If URC 522 applies, then each bank is bound to "act in good faith and exercise reasonable care." *Id.* at Art. 9.

In a documentary collection, the remitting and collecting banks are not liable if the importer refuses to pay. *See Monarch Gems v. Malca-Amit USA*, 2007 WL 2892636, at *9 (N.D. Ill. Sept. 27, 2007) ("Banks involved in a documentary collection do not guarantee payment or assume credit risks."); *Texful Textile Ltd. v. Cotton Exp. Textile, Inc.*, 891 F. Supp. 1381, 1388 (C.D. Cal. 1995) ("Even a brief review of the nature of documentary collections shows that by

definition, banks operate solely as conduits in these transactions.").  In the case of nonpayment, the collecting bank should send the remitting bank notice of the nonpayment.  URC 522, Art. 26(c)(3).  The remitting bank must then give instructions as to how to handle the nonpayment within sixty days.  *Id.*  If such instructions are not given, then the collecting bank may return the documents to the remitting bank and will bear no further responsibility.  *Id.*

The contracts between Select Harvest and Agson called for delivery of the almonds in India, with a final destination of "ICD Faridabad or in some cases Nhava Sheva."  *See* Greenwald Decl. ¶ 9; Dkt. Nos. 17-9–17-20.  The collecting instructions request that IOB "acknowledge receipt of [the instructions] to use via SWIFT."  Dkt. No. 17-5 at ECF p. 3.  The record is silent as to whether IOB acknowledged receipt of the collecting instructions for any of the fifty-eight orders in 2021.  However, on March 18, 2022, IOB sent to the Wells Fargo branch in Philadelphia, Pennsylvania a SWIFT message, indicating that it had received all fifty-eight sets of original documents.  Dkt. No. 17-6; Dkt. No. 21-13.  The shipments arrived at the port of Nhava Sheva, India between April and July 2021.  Greenwald Decl. ¶ 9.  Select Harvest claims that the shipments were discharged after IOB "wrongfully allowed the original bills of lading, certificates of original and phytosanitary certificates to be presented to the carrier and to Indian customs officials" without receiving payment from Agson and remitting the payments to Wells Fargo.  *Id.* ¶¶ 9, 11.  Since then, Wells Fargo and IOB have sent several SWIFT messages to each other concerning the remittance of the required payments or return of the original documents.  Each message that the parties provided the Court was either sent from or sent to Wells Fargo's Philadelphia, Pennsylvania branch.  *See* Dkt. Nos. 17-6, 17-7, 21-4, 21-5, 21-7, 21-8, 21-9.

On March 18, 2022, IOB sent a SWIFT message to Wells Fargo indicating that it had received a message from Wells Fargo on March 10, 2022, demanding payment or return of all original documents.  Dkt. No. 17-6 at ECF p. 1.  IOB confirmed that "we are holding the original documents with us and as requested by you we will return the documents if the bills remain unpaid by 31 March 2022."  *Id.* (cleaned up).  Agson apparently did not pay the bill and IOB did not return the documents by the March 31, 2022 deadline.  On April 4, 2022, IOB requested via SWIFT message confirmation "whether the documents have to be returned to Select Harvest" and stated that it was "holding the documents at our counter on your risk and responsibility till your further instruction."  Dkt. No. 17-7 at ECF p. 2 (cleaned up).  On May 21, 2022, Wells Fargo sent a SWIFT message to IOB stating that "[w]e have been informed by [Select Harvest], they are demanding your bank to send all the original and duplicate documents including drafts for" all fifty-eight orders.  Dkt. No. 21-4 at ECF p. 1 (cleaned up).  IOB responded on May 24, 2022, requesting that Wells Fargo confirm that payments for three of the orders were received by Select Harvest and that Wells Fargo "allow us to return the remaining original 55 bills to you." Dkt. No. 21-5.  Wells Fargo confirmed payment of three of the orders and again demanded payment in full or a return of the original documents on June 10, 2022.  Dkt. No. 21-8 at ECF p. 1.  On June 14, 2022, IOB sent several packages via DHL to Wells Fargo's offices in El Monte, California.  *See* Dkt. No. 21-10.  IOB stated in a June 15 SWIFT message that the packages contained original bills of lading for the fifty-five unpaid orders.  Dkt. No. 21-9 at ECF p. 2; *see also* Dkt. No. 17-75 (letter from IOB, dated June 14, 2022, indicating that IOB was returning the "Original Documents" for certain of the fifty-five unpaid orders); Dkt. No. 22-1 ("Sahu Decl.") ¶ 4 (declaring that the bills of lading were returned to Wells Fargo).  DHL confirmed that the packages were delivered to the California offices of Wells Fargo on June 16 and June 17, 2022.

Dkt. No. 21-10 at ECF pp. 2, 5.  Wells Fargo also confirmed that it received the documents and returned them to Select Harvest; the return letters indicate that the certificates of origin and phytosanitary certificates were copies, not originals.  *See* Dkt. Nos. 17-21–17-74.

To date, payment has been remitted for only four of the fifty-eight loads, totaling $278,255.96.  *See* Greenwald Decl. ¶ 8.  Each payment was made to a Wells Fargo branch in Philadelphia, Pennsylvania.  *See* Dkt. No. 21 at 11; Dkt. No. 25 at 18.

### PROCEDURAL HISTORY

Plaintiff commenced this action by complaint on May 13, 2022.  Dkt. No. 1 ("Complaint").  On May 20, 2022, Plaintiff served in New York IOB's authorized agent for service of process, Global Payment Advisory Group ("GPAG").[2]  Dkt. No. 6; Dkt. No. 1, Ex. 1 (certifying that GPAG "is authorized to accept service of legal process . . . from the Secretary of the Treasury or the Attorney General of the United States").  On June 9, 2022, Rajiv Mallick, an Assistant General Manager at the Defence Colony Branch of IOB, sent an email to John Santopietro, a Director of Agent Services at GPAG, with its "Reply" to Select Harvest's summons and requested that he arrange delivery of the reply to Select Harvest or its attorney Clyde & Co. US LLP "within the stipulated timeliness *i.e.*, 10th June 2022."  Dkt. No. 17-1 at ECF p. 1 (cleaned up).  Both a representative of Select Harvest and Select Harvest's attorney were copied on the email.  *See id.*  Santopietro responded that GPAG's role as process agent was to deliver the summons to Select Harvest "which we have done."  *Id.*

On June 10, 2022, the day that IOB's answer was due, Plaintiff's counsel received a voicemail from Joe Schmit, Esq. of Phillips Lytle LLP.  Greenwald Decl. ¶ 5.  Schmit indicated that he was not representing IOB in this action, but he requested consent for an extension of time

---

[2] IOB is required by the USA PATRIOT Act of 2001 (the "Patriot Act") to maintain an agent for service of process in the United States.  *See* 31 U.S.C. § 5318(k).

to respond to the Complaint; Plaintiff responded that it would consent to an extension of thirty days if IOB consented to this Court's jurisdiction and the adequacy of service of process by voicemail and email to Schmit. *Id.* Schmit did not reply. *Id.*

The Court issued a notice of initial pretrial conference on July 19, 2022 (the "Initial Pretrial Conference"), Dkt. No. 7, which Plaintiff's counsel forwarded to Mallick, Dkt. No. 17-3 at ECF p. 1. By separate letter on July 19, 2022, Plaintiff's counsel advised Mallick that "Select Harvest intends to commence default proceedings against IOB immediately." Dkt. No. 17-4 at 1. Plaintiff's counsel notified the Court by letter on August 4, 2022, that it intended to obtain a certificate of default and default judgment, Dkt. No. 11; the Clerk of Court entered a certificate of default on August 5, 2022, Dkt. No. 12; and at the Initial Pretrial Conference on August 10, 2022, the Court gave Select Harvest until August 12, 2022 to file its motion for default judgment after no counsel appeared for Defendant, *see* Minute Entry, August 10, 2022.

Plaintiff submitted its motion for default judgment, along with a supporting declaration, on August 16, 2022.[3] Dkt. Nos. 16–17. The Court held a hearing on Plaintiff's motion for default judgment on August 29, 2022, at which no counsel appeared for Defendant. *See* Minute Entry, August 29, 2022. The Court took the motion for default judgment under advisement. *Id.* On November 22, 2022, counsel for Defendant entered a notice of appearance. Dkt. No. 20. The Court held a status conference on December 8, 2022. *See* Minute Entry, December 8, 2022. The Court gave Defendant until December 22, 2022, to file a motion in opposition to the motion for default judgment, expressing concern that it did not have personal jurisdiction over Defendant. *See* December 8, 2022, Transcript ("Tr.") 7, 9.

---

[3] Plaintiff first attempted to file its motion for default judgment and supporting declaration on August 12, 2022, but the declaration was rejected by the Clerk of the Court for a filing error. Dkt. No. 13.

Defendant filed a motion to dismiss for lack of jurisdiction and a memorandum of law in opposition to Plaintiff's motion for default judgment on December 22, 2022.  Dkt. Nos. 21–22.[4] Plaintiff filed a memorandum of law in opposition to both motions and a supporting declaration on February 17, 2023, Dkt. Nos. 25–26, to which Defendant replied on March 14, 2023, Dkt. No. 32.

## DISCUSSION

Under Federal Rule of Civil Procedure 55(c), a "court may set aside an entry of default for good cause."  The Second Circuit has held that, in determining whether good cause has been

---

[4] The Court construes Defendant's memorandum of law in opposition to Plaintiff's motion for default judgment as a motion to set aside the entry of default under Federal Rule of Civil Procedure 55(c).  *See Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir. 1981) ("[An] opposition to a motion for a default judgment can be treated as a motion to set aside the entry of a default despite the absence of a formal Rule 55(c) motion."); *Sea Hope Navigation Inc. v. Novel Commodities SA*, 978 F. Supp. 2d 333, 337 (S.D.N.Y. 2013) (collecting cases) (same).  The Court has serious questions about whether Defendant's motion to dismiss for lack of jurisdiction is properly before the Court.  The Court only gave Defendant permission to file a motion to vacate the entry of default and directed Defendant to address the question of personal jurisdiction therein.  Tr. 8–9.  The plain language of Federal Rule of Civil Procedure 12 does not impose a twenty-one day time limit on a motion to dismiss for one of the enumerated defenses in Rule 12(b).  *See generally* Fed. R. Civ. P. 12; *see also Hedeen Int'l, LLC v. Zing Toys, Inc.*, 811 F.3d 904, 906 (7th Cir. 2016); 5C Charles A. Wright, *et al.*, Fed. Prac. & Proc. Civ. § 1391 (3d ed. 2004, supp. 2022) ("Simply put, there is no warrant for treating the passage of the Rule 12(a) period as a basis for waiver of Rule 12(b) motions; a motion under the rule is timely as long as it is made before the filing of a responsive pleading.").  However, among the "inherent powers possessed by district courts . . . [is the inherent power] to manage its docket and courtroom with a view toward the efficient and expedient resolution of cases."  *Dietz v. Bouldin*, 579 U.S. 40, 41 (2016).  It is thus not inconsistent for the Court to conclude that, while Defendant has not waived its defense of a lack of personal jurisdiction, it impermissibly brought a motion to dismiss on those grounds.

The Court need not decide at this point whether the motion is properly before it because the Court can consider the arguments raised therein in connection with Plaintiff's motion for entry of default judgment.  *See Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.*, 619 F.3d 207, 213 (2d Cir. 2010) (noting that, although a district court should generally "*not* raise personal jurisdiction *sua sponte*" because it is a defense that can be waived, "before a court grants a motion for default judgment, it may first assure itself that it has personal jurisdiction over the defendant" (emphasis in original)).

shown, a district court should weigh three "widely accepted factors": "(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993). "Other relevant equitable factors may also be considered," including "whether the failure to follow a rule of procedure was a mistake made in good faith and whether the entry of default would bring about a harsh or unfair result." *Id.* "Although the factors examined in deciding whether to set aside a default or a default judgment are the same, courts apply the factors more rigorously in the case of a default judgment, because the concepts of finality and litigation repose are more deeply implicated in the latter action." *Id.* (citation omitted). The decision whether to set aside a default is "committed to the discretion of the district court." *Traguth v. Zuck*, 710 F.2d 90, 94 (2d Cir. 1983) (citation omitted).

The Second Circuit "has expressed on numerous occasions its preference that litigation disputes be resolved on the merits, not by default." *Cody v. Mello*, 59 F.3d 13, 15 (2d Cir. 1995); *see also Brien v. Kullman Indus., Inc.*, 71 F.3d 1073, 1077 (2d Cir. 1995) (noting that there is a "limitation on the scope of the district court's discretion" because of the Second Circuit's "preference for resolving disputes on the merits"). It has "described default judgments as 'the most severe sanction which the court may apply.'" *Id.* (quoting *Sec. & Exchange Comm'n v. Mgmnt Dynamics, Inc.*, 515 F.2d 801, 814 (2d Cir. 1975)). These considerations drive the principle that, "in ruling on a motion to vacate a default judgment, all doubts must be resolved in favor of the party seeking relief." *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005); *see also Powerserve Int'l, Inc. v. Lavi*, 239 F.3d 508, 514 (2d Cir. 2001) ("Because there is a preference for resolving disputes on the merits, doubts should be resolved in favor of the defaulting party." (internal quotation marks and citation omitted)).

## I.   Willfulness

Willfulness "refer[s] to conduct that is more than merely negligent or careless."

*Bricklayers & Allied Craftworkers Loc. 2, Albany, N.Y. Pension Fund v. Moulton Masonry &*

*Const., LLC*, 779 F.3d 182, 186 (2d Cir. 2015) (quoting *SEC v. McNulty*, 137 F.3d 732, 738

(2d Cir. 1998)).  "Even gross negligence does not lead to a finding of willfulness."  *Fischer v.*

*Forrest*, 2014 WL 2717937, at *3 (S.D.N.Y. June 16, 2014).  Instead, the conduct must be

"egregious and . . . not satisfactorily explained."  *Moulton Masonry & Const., LLC*, 779 F.3d at

186 (quoting *McNulty*, 137 F.3d at 738).  The Second Circuit has indicated that "a finding of bad

faith is [not] a necessary predicate to concluding that a defendant acted willfully.  Rather, it is

sufficient to conclude that the defendant defaulted deliberately."  *Id.* at 187 (internal quotation

marks omitted) (quoting *Gucci Am., Inc. v. Gold Ctr. Jewelry*, 158 F.3d 631, 635 (2d Cir. 1998)).

However, the defaulting party's good or bad faith is relevant in determining whether the entry of

default should be excused for good cause.  *See Enron Oil Corp.*, 10 F.3d at 96.

Whether Defendant's default was willful is a close question.  IOB proffers two

explanations for why it did not appear in this case until after default had been entered.  First, IOB

thought that "no cause of action needed to be adjudicated" because it had returned the original

documents and bills of lading to Wells Fargo.  Dkt. No. 22 at ECF p. 7.  Second, IOB claims that

it is a government bank and that internal processes and the impact of COVID-19 delayed its

response.  *See id.* at ECF p. 7–8; Dkt. No. 32 at ECF p. 9; Sahu Decl. ¶¶ 8–9.  Select Harvest

counters that because IOB has not denied that it received or failed to answer the Complaint and

does not cite circumstances that were beyond its control, the Court can infer willfulness.  *See*

Dkt. No. 25 at 9–10.

There is evidence that bespeaks willfulness on the part of IOB.  A court can infer

willfulness from the facts that the defaulting party "received the complaint, the court's orders,

[and] the notice of default judgment, [and] that he never answered the complaint . . . [or posit] that his non-compliance was due to circumstances beyond his control." *Guggenheim Cap., LLC v. Birnbaum*, 722 F.3d 444, 455 (2d Cir. 2013); *see also Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 243–44 (2d Cir. 1994) (same).  IOB does not dispute that it was aware of this action, knew that its answer was due on June 10, 2022, and failed to respond.  *See* Dkt. No. 17-1 at ECF p. 1.  Nor does IOB contest that it received notice of the Initial Pretrial Conference from Plaintiff, Dkt. No. 17-3 at ECF p. 1, or that it received notice that Plaintiff intended to move for a default judgment if IOB did not appear in the action, Dkt. No. 17-4.  However, Defendant's actions do not reflect a strategic decision to avoid litigation of this case.  *See Am. All. Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 60 (2d Cir. 1996) (noting, in the Rule 60(b) context, that the Second Circuit has "refused to vacate a judgment where the moving party had apparently made a strategic decision to default").

After receiving a copy of the Complaint from GPAG, IOB sent a "Reply" to the Director of Agent Services at GPAG, and requested that he arrange delivery to Select Harvest or its attorney "within the stipulated timeliness *i.e.* 10th June 2022."  Dkt. No. 17-1 at ECF p. 1 (cleaned up).  IOB never filed this "Reply."  Instead, it sought payment from Agson, and when that failed, it returned the original documents, which it believed mooted the underlying cause of action and its need to appear.  *See* Sahu Decl. ¶¶ 3, 4; *see also* Dkt No. 21-7 at ECF p. 2 (indicating, in a SWIFT message to Wells Fargo, that IOB should not have been made a party to the lawsuit because of the "continuous communication between us" (cleaned up)).  After IOB asked an attorney to "check the status of the case" and realized that there was a motion for default judgment outstanding, it instructed an attorney to appear in this matter.  Sahu Decl. ¶ 5.

Although "[a] defendant's responsibility to file a responsive pleading . . . is not obviated by participating in efforts which could, in theory, later resolve the case," *Moulton Masonry & Const., LLC*, 779 F.3d at 186, "[a] defendant's incorrect assumptions about court processes and the obligation to respond to an action may support a showing that a default was not willful," *Hong v. Mommy's Jamaican Mkt. Corp.*, 2021 WL 6064101, at *3 (S.D.N.Y. Dec. 22, 2021). Here, Defendant's "incorrect assumptions" could reflect an unfamiliarity with the American legal system, not a deliberate attempt to avoid this action. Defendant is a banking corporation incorporated under the laws of India and owned by the Government of India. *See* Dkt. No. 22 at ECF p. 7. Every indication is that IOB has no branches or other offices within the United States and that its only direct relationship to the United States is through a correspondent account; Plaintiff attached IOB's Certification Regarding Correspondent Accounts for Foreign Banks, which is only required for "foreign bank[s] . . . organized under foreign law and located outside of the United States." Dkt. No. 1, Ex. 1. Defendant did not seek to shirk responsibility in this action; it emailed an answer to Plaintiff and acted under the (incorrect) assumption that addressing the underlying issues would moot the cause of action. Thus, Defendant's actions "might have been the product of confusion and neglect, particularly given their possible lack of familiarity with U.S. legal procedure." *Bartman v. L'Officiel USA Inc.*, 2021 WL 5303915, at *3 (S.D.N.Y. Nov. 15, 2021).

The Second Circuit has held that a court can infer willfulness under circumstances similar to those presented. *Guggenheim Cap., LLC*, 722 F.3d at 455; *Com. Bank of Kuwait*, 15 F.3d at 243–44. But the Second Circuit has not held that a court *must* infer willfulness under these circumstances. In this case, the Court need not decide what side of the line Defendant's actions fall. "Even if [IOB's] conduct were willful, for the reasons explained below, there would be

sufficient reason to find good cause in this case." *Murray Eng'g, P.C. v. Windermere Properties LLC*, 2013 WL 1809637, at *5 (S.D.N.Y. Apr. 30, 2013); *see also Hong*, 2021 WL 6064101, at *3 ("Even if [the defendants' actions] could be characterized as willful, [they are] so close to the line that, given the other factors in the case, the judgment should be vacated.").

## II.     Meritorious Defense

Vacating the entry of default should not be a pointless exercise; a court should only vacate an entry of default when the defaulting party has some prospect of avoiding a judgment— that is, when it has a meritorious defense. *See State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 174 (2d Cir. 2004) ("[T]he absence of such a defense is sufficient to support [a] district court's denial of" a motion to vacate a default judgment). "'To make a sufficient showing of a meritorious defense' on a motion to vacate a default judgment, a movant 'need not establish his defense conclusively,' but must present evidence of facts that, 'if proven at trial, would constitute a complete defense.'" *Gunnells v. Teutul*, 469 F. Supp. 3d 100, 104 (S.D.N.Y. 2020) (quoting *McNulty*, 137 F.3d at 740); *see also Enron Oil Corp.*, 10 F.3d at 98 ("The test of [a meritorious] defense is measured not by whether there is a likelihood that it will carry the day, but whether the evidence submitted, if proven at trial, would constitute a complete defense.").

Defendant presents two defenses.  First, Defendant argues that this Court lacks jurisdiction to adjudicate the claims.  *See* Dkt. No. 21 at 6–12.  Second, Defendant contends that it returned all of the original import documents to Wells Fargo, which satisfied its obligations under URC 522.  *See* Dkt. No. 22 at ECF p. 7; Dkt. No. 32 at ECF p. 11–12.

"[B]efore a court grants a motion for default judgment, it may first assure itself that it has personal jurisdiction over the defendant." *Sinoying Logistics Pte Ltd.*, 619 F.3d at 213.  That is because a default judgment is void if it is entered without personal jurisdiction. *See Ins. Corp. of*

*Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982) ("A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding."); *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 139 (2d Cir. 2011) ("[I]n such a case, 'voidness of a judgment for lack of personal jurisdiction can be asserted on a collateral challenge' pursuant to Rule 60(b)(4)." (quoting *"R" Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 123 (2d Cir. 2008))); *Spin Master Ltd. v. 158*, 463 F. Supp. 3d 348, 362 (S.D.N.Y. 2020) ("In the absence of a proper pleading of personal jurisdiction, Plaintiffs had no right to demand an answer to their Complaint.").  To determine whether the exercise of personal jurisdiction is proper in a diversity case, the Court must conduct a two-part inquiry: first, the Court looks at whether there is a basis for personal jurisdiction under the laws of the forum state, and second, the Court must examine whether the exercise of personal jurisdiction comports with constitutional due process.  *See Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir. 2013); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002).[5]  Here, the Court finds that there are serious

---

[5] In its reply memorandum of law in further support of its motions to dismiss and to vacate the default judgment, Defendant, for the first time, raised a defense of insufficiency of service of process under Federal Rule of Civil Procedure 12(b)(5).  *See* Dkt. No. 32 at ECF pp. 5–8. Defendant argues that service of process was improper because GPAG, its agent for service of process, was only authorized to accept service from the Secretary of the Treasury or the Attorney General of the United States and not from private parties.  *Id.*  Plaintiff moves to strike this argument because Defendant's "failure to assert this defense in the initial response to the Complaint waives the defense" under Rule 12(h)(1).  Dkt. No. 33 at 1; *see also* Dkt. No. 21 at ECF p. 1 (Defendant's Motion to Dismiss the Complaint only asserting defenses under Rule 12(b)(1), (b)(2), and (b)(3) and *not* under (b)(5) for insufficient process).  Because the Court defers ruling on whether it has personal jurisdiction over this case until after Plaintiff has completed limited jurisdictional discovery, *see infra* pp. 23–24, the Court will also defer ruling on whether Defendant waived its service of process defense.  *Cf. de Ganay v. de Ganay*, 2012 WL 6097693, at *5 (S.D.N.Y. Dec. 6, 2012) (noting that a court "need not resolve the parties' dispute regarding whether service of process was proper" because the court found that it could not "assert personal jurisdiction over defendants" under New York's long-arm statute). Plaintiff's motion to strike is thus denied without prejudice to renewal of the arguments

questions concerning whether it has jurisdiction over Defendant; Defendant has presented facts, that if proven, would constitute a complete defense to this action.  *See Lou v. Kim*, 2015 WL 5580330, at *6 (S.D.N.Y. Sept. 14, 2015) ("A lack of personal jurisdiction constitutes a meritorious defense."); *Standard Enterprises, Inc. v. Bag-It, Inc.*, 115 F.R.D. 38, 40 (S.D.N.Y. 1987) (Plaintiff's "defense is that this court lacks *in personam* jurisdiction over it, which, if true, would constitute a complete defense.").

Plaintiff only contends that this Court has specific jurisdiction over IOB, not general jurisdiction under N.Y. C.P.L.R. § 301.  *See* Dkt. No. 1 ¶¶ 7–9.  New York's specific jurisdiction statute states that:

> [A] court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> > 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
> >
> > 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
> >
> > 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or owns, uses or possesses any real property situated within the state.

---

contained therein should Defendant seek to assert a defense based on insufficiency of service of process in a future motion.

The Court pauses to note that, contrary to Defendant's claim, Plaintiff has not sought to "mislead" the Court in any way.  Plaintiff attached IOB's certification indicating that IOB had appointed GPAG as its agent for service of process under the Patriot Act to the Complaint and at no time hid the pertinent facts from the Court.  *See* Dkt. No. 1, Ex. 1.

N.Y. C.P.L.R. § 302(a).  Plaintiff alleges that "Defendant is subject to *in personam* jurisdiction in New York pursuant to CPLR 302(a) because, . . . the Plaintiff's causes of action arise from Defendant's transaction of business within New York."  Dkt. No. 1 ¶ 7.[6]  To establish jurisdiction under Section 302(a)(1), a plaintiff must allege that: (1) the defendant has "transacted business" in New York, and (2) the claim asserted arises from that business activity. *Eades v. Kennedy PC L. Offs.*, 799 F.3d 161, 168 (2d Cir. 2015); *see Licci ex rel. Licci*, 732 F.3d at 168.  Under the first prong, a non-domiciliary defendant need not be physically present in New York to "transact business," so long as the defendant has engaged in "purposeful activity," for example, "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246–47 (2d Cir. 2007) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  Under the second prong, "a suit will be deemed to have arisen out of a party's activities in New York if there is 'an articulable nexus,' or a 'substantial relationship,' between the claim asserted and the actions that occurred in New York." *Id.*

---

[6] The Complaint asserts that the Court also has jurisdiction under N.Y. C.P.L.R. § 302(a)(2) and (a)(3). *See* Dkt. No. 1 ¶¶ 8–9. However, both assertions are unavailing at this stage.  All of Defendant's allegedly tortious activity (the improper release of the original bills of lading, in contravention of its obligations under URC 522, and the alleged conversion of Plaintiff's property in India, *see* Dkt. No. 1 ¶ 33) took place outside of New York, so Plaintiff cannot rely on Section 302(a)(2). *See Thackurdeen v. Duke Univ.*, 660 F. App'x 43, 46 (2d Cir. 2016) ("[A] defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)." (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999))).  Similarly, "[i]t is settled New York law that the suffering of economic damages in New York is insufficient, alone, to establish a 'direct' injury in New York for N.Y. C.P.L.R. § 302(a)(3) purposes." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 38 (2d Cir. 2010). Plaintiff has not at this stage presented evidence that it suffered anything other than economic damages in New York (the alleged failure to remit the purchase price of the almonds to a New York bank account) and thus any assertion of jurisdiction under Section 302(a)(3) must also fail. In fact, in its memorandum of law in opposition to Defendant's motions, Plaintiff only claims that the Court has jurisdiction over Defendant under Section 302(a)(1). *See* Dkt. No. 25 at 16.

(internal quotation marks omitted and alteration accepted) (quoting *Henderson v. INS*, 157 F.3d 106, 123 (2d Cir. 1998)).  The Court finds that Defendant has presented a potentially meritorious defense with respect to whether this Court has personal jurisdiction over it.

The only alleged ties between IOB and New York, for purposes of this action, are (1) IOB's maintenance of a correspondent account in New York, Dkt. No. 1 ¶ 5, presumably through which any remitted payments would have to travel, and (2) the direction in the collecting instructions to IOB "to remit proceeds via Fedwire transfer . . . to our Wells Fargo Bank NA, New York, (Swift Code: PNBPUS3NNYC)," Dkt. No. 26-1; *see also* Dkt. No. 1 ¶¶ 11, 17. However, it is undisputed at this stage that all of the alleged activity related to this action took place outside of New York.  The almonds were shipped from California to India, *see, e.g.*, Dkt. No. 17-23 at ECF p. 8 (identifying the "Port of Loading as Oakland" and the "Foreign Port of Unloading" as Nhava Sheva, India), and IOB allegedly impermissibly presented the original bills of lading in India, *see* Dkt. No. 1 ¶¶ 19–21.  All of the SWIFT messages that IOB sent to Wells Fargo and that Wells Fargo sent to IOB were sent to or from a Wells Fargo branch in Philadelphia, Pennsylvania.  *See* Dkt. Nos. 17-6, 17-7, 21-4, 21-5, 21-7, 21-8, 21-9.  And each of the four payments that IOB remitted to Wells Fargo were sent to the same Philadelphia, Pennsylvania branch.  *See* Dkt. No. 21 at 11; Dkt. No. 25 at 18.

"A plaintiff 'must establish the court's jurisdiction with respect to each claim asserted.'" *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).  With respect to Plaintiff's second cause of action, conversion of Plaintiff's property, there is no dispute that the conversion occurred in India.  Thus, absent additional facts, the Court cannot exercise personal jurisdiction over IOB on this claim.  *See Popper v. Podhragy*, 48 F. Supp. 2d 268, 273 (S.D.N.Y. 1998)

(finding that personal jurisdiction did not lie over defendants because the "conversion did not occur in New York").  It is somewhat of a closer question whether Plaintiff has made a *prima facie* showing whether jurisdiction exists with respect to its first cause of action for violation of URC 522's requirement that the collecting bank "act in good faith and exercise reasonable care." *See* URC 522, Art. 9.  However, the Court questions whether the two alleged contacts between Defendant and New York are sufficient for personal jurisdiction to lie over Defendant for its failure to act in good faith and to exercise reasonable care in its role as a collecting bank.

*Neewra, Inc. v. Manakh Al Khaleej General Trading & Contracting Co.*, 2004 WL 1620874 (S.D.N.Y. July 20, 2004), is instructive.  In *Neewra*, The Honorable Judge Michael B. Mukasey held that the court could not exercise jurisdiction over a remitting bank based on the presence of a correspondent account in New York.  *See id.* at *3.  There, the plaintiff contracted to supply $2.5 million of software to Manakh al Khaleej General Trading and Contracting Co. ("Manakh"), a Kuwaiti company.  *Id.* at *1.  In connection with that transaction, the plaintiff appointed ABN Amro Bank in New York as its remitting bank and Manakh appointed Kuwait Finance House ("KFH") as its collecting bank.  *Id.*  KFH was instructed to remit the payment to one of several ABN Amro Bank accounts, with ultimate payment to plaintiff's bank account in New York.  *Id.*  KFH had used its correspondent bank in New York to effect a transfer in connection with an earlier transaction to ABN Amro Bank and the court presumed it would have used the New York correspondent account in the transaction at issue.  *Id.* at *1, *3.  The plaintiff alleged that KFH gave Manakh the original documents without first obtaining payment from Manakh, which Manakh used to prepare forgeries that enabled it to take possession of the software.  *Id.* at *1.  As a result, the plaintiff alleged that it did not receive payment for the

goods, even though Manakh took possession of the software.  The plaintiff sued Manahk and KFH, and KFH moved to dismiss for lack of jurisdiction.  *Id.*

Judge Mukasey held that there was an insufficient nexus between KFH's correspondent account and the cause of action to exercise jurisdiction over KFH under Section 302(a)(1).  *Id.* *3–5.  Specifically, Judge Mukasey concluded that because KFH had not remitted any payments related to the document collection transaction to New York, KFH did "not purposefully avail[] itself of the privilege of conducting business in New York."  *Id.* at *5.  The court rejected the plaintiff's argument that KFH transacted business within New York under the first prong of Section 302(a)(1) because it used an account in New York to transfer payment in connection with the earlier transaction and would have used it in connection with the $2.5 million transaction.  The court reasoned that the pertinent question was "whether a foreign domiciliary actually transacted business in New York, not whether it might have done so in a hypothetical situation that never occurred, [and] KFH[] did not engage in any activities in New York . . . apart from maintaining a correspondent account with Citibank."  *Id.* at *4.

*Neewra* would seem to be indistinguishable from this case.  Here, Plaintiff does not allege that IOB remitted any payment to New York in connection with these transactions; in fact, Plaintiff acknowledges that all payments were made to a Wells Fargo branch in Philadelphia, Pennsylvania.  Dkt. No. 25 at 18.  Rather, Plaintiff's allegations focus on the possibility that IOB would have remitted payment to New York if it had received payment from Agson and appropriately followed the payment instructions.[7]  In addition, as in *Neewra*, IOB agreed only to

---

[7] The payment instructions direct IOB to remit the proceeds "for further credit to [a separate] account."  *See* Dkt. No. 26-1 at ECF p. 3.  The instructions do not indicate where the account is located, including whether the account is located in New York.

transfer the payments it received to the remitting bank for ultimate delivery to Plaintiff, and not to act as guarantor.  *See Neewra*, 2004 WL 1620874, at *4.[8]

Plaintiff argues that this case is distinguishable, because IOB agreed, when it accepted its role as a collecting bank, to remit any payment it received to Wells Fargo's New York branch. *See* Dkt. No. 25 at 18.  It is questionable whether the act of remitting money to the New York branch of a bank alone is sufficient to give rise to personal jurisdiction for a breach of contract. *See Hart v. Tri-State Consumer, Inc.*, 2021 WL 5180923, at *4 (S.D.N.Y. Nov. 6, 2021) (collecting cases) ("Nevertheless, communications with and payments to a New York resident, by themselves, are generally insufficient to establish personal jurisdiction."); *Cont'l Field Serv. Corp. v. ITEC Int'l, Inc.*, 894 F. Supp. 151, 154 (S.D.N.Y. 1995) (holding that court did not have jurisdiction under Section 302(a)(1) where defendant's "only contact with New York was its wiring of payments at [plaintiff's] request to a[n] . . . account in New York"); *Roper Starch Worldwide, Inc. v. Reymer & Assocs., Inc.*, 2 F. Supp. 2d 470, 475 (S.D.N.Y. 1998) ("[M]erely sending payment to New York is not sufficient to establish personal jurisdiction over a defendant under § 302(a)(1)."); *Pramer S.C.A. v. Abaplus Int'l Corp.*, 907 N.Y.S.2d 154, 159 (1st Dep't 2010) (same).  However, it is not necessary to decide how those cases would apply here because it is undisputed that IOB never actually remitted payment to the Wells Fargo account in New York and Plaintiff has not offered any other facts establishing IOB's ties to New York.  Thus,

---

[8] The Court does not hold that a correspondent bank account can never be the basis for personal jurisdiction.  Rather, the Court holds that in order for the correspondent bank account to serve as the basis for personal jurisdiction, there must be an "articulable nexus" between the relevant activities of Defendant related to the correspondent bank account and the claim at issue.  *See generally Licci v. Lebanese Canadian Bank*, 984 N.E.2d 893, 899 (N.Y. 2012); *see also Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, 477 F. Supp. 3d 241, 255 (S.D.N.Y. 2020) (considering only defendant's "New York contacts that give rise to plaintiffs' claims" in analysis of whether the court had jurisdiction over defendant).

IOB did not "purposefully avail[] itself of the privilege of conducting activities within" New York and the lawsuit cannot be said to arise out of IOB's activities in New York.  *Best Van Lines, Inc*., 490 F.3d at 246–47.

Plaintiff argues that the New York Supreme Court's decision in *Mashreqbank PSC v. Indian Overseas Bank*, 2022 WL 624600, at *1 (N.Y. Sup. Ct. Mar. 1, 2022), should govern this case.  Dkt. No 25 at 18–19.  Even if a New York State trial court decision were controlling on this Court, which it is not, *see Rodland v. Judlau Contracting, Inc.*, 844 F. Supp. 2d 359, 363 (S.D.N.Y. 2012) (collecting cases), *Mashreqbank* is distinguishable.  *Mashreqbank* involved a letter of credit issued by IOB.  *Mashreqbank PSC*, 2022 WL 624600, at *1.  A letter of credit is an "irrevocable promise to pay the beneficiary when the latter presents certain documents . . . that conform with the terms of the credit," *United States v. Calderon*, 944 F.3d 72, 79 (2d Cir. 2019) (citation omitted and alteration accepted).  "Its purpose is to facilitate international trade by reducing the risk of nonpayment in cases where credit is extended by 'interposing a known and solvent institution's credit' for that of an unknown and potentially insolvent institution."  *TC Skyward Aviation U.S., Inc. v. Deutsche Bank AG, New York Branch*, 557 F. Supp. 3d 477, 485 (S.D.N.Y. 2021) (citation omitted and alteration accepted).  Thus, "[a] letter of credit is independent from the underlying transaction that gave rise to it."  *Id.* at 486; *see also First Com. Bank v. Gotham Originals, Inc.*, 475 N.E.2d 1255, 1259 (N.Y. 1985) ("The fundamental principle governing [letters of credit] is the doctrine of independent contracts.").

In a documentary letter of credit transaction, the issuing bank can appoint a negotiating bank and a reimbursing bank.  *See* 1 Going Global § 11:11.  By nominating a negotiating bank, the issuing bank "authorizes such bank to . . . negotiate . . . against documents which appear on their face to be in compliance with the terms and conditions of the Credit [sic] and undertakes to

reimburse such bank . . . ." *Brenntag Int'l Chemicals, Inc. v. Norddeutsche Landesbank GZ*, 9 F. Supp. 2d 331, 342 (S.D.N.Y. 1998), *aff'd sub nom. Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999) (quoting Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500, Article 10(d)).  If the negotiating bank disperses funds in connection with the letter of credit, 1 Going Global § 11:11, then it "acquire[s] rights [against the letter of credit issuer] . . . 'to the same extent as if it were named as beneficiary of the credit.'"  *First Com. Bank*, 475 N.E.2d at 1260 (citation omitted).

The letter of credit issued by the defendant in *Mashreqbank* established that "plaintiff, a New York domiciliary, would be the negotiating bank, that Wells Fargo, another New York domiciliary, would be the reimbursing bank, and that reimbursement would take place in New York."  *Mashreqbank PSC*, 2022 WL 624600, at *3.  The defendant explicitly authorized the New York plaintiff to negotiate the letter of credit, and the New York plaintiff negotiated the letter of credit and remitted payment to the beneficiary's bank.  *Id.* at *1.  As a result, the New York plaintiff developed an entitlement to reimbursement under the letter of credit.  *See id.* After Wells Fargo, the reimbursing bank, indicated that the defendant had not yet authorized reimbursement, the plaintiff sued IOB as the issuer of the letter of credit.  *Id.* at *1–2.  The contacts between the letter of credit at issue in *Mashreqbank* and New York are unlike the contacts here.  There, the defendant called for the place of payment to be New York, designated a negotiating bank located in New York, authorized that bank to negotiate the letter of credit, and designated another New York bank as the reimbursing bank.  In contrast, here, construing the evidence favorably to Plaintiff, Wells Fargo designated that payment was to be made in New

York through the collecting instructions, but none of Defendant's activities were directed at New York—payment and all communications were made by IOB to Philadelphia.

The Court, however, need not determine whether it lacks jurisdiction over Defendant to conclude that Defendant's argument reflects a defense that is potentially meritorious.[9] Defendant has presented evidence and argument that tend to show that the Complaint as currently pleaded and Plaintiff's affidavits do not allege facts that would make a prima facia showing that personal jurisdiction lies with this Court. *See Guglielmo v. JEGS Auto., Inc.*, 2021 WL 1026168, at *2 (S.D.N.Y. Mar. 17, 2021) ("If an evidentiary hearing is not held, plaintiff need make only a prima facie showing by its pleadings and affidavits that jurisdiction exists."). During the December 8, 2022 status conference, the Court requested limited briefing on the issue of personal jurisdiction, focused on Judge Mukasey's decision in *Neewra*. *See* Tr. 9, 11. Plaintiff's response to that Order is not sufficient to establish that it has personal jurisdiction or to rebut Defendant's claim that the Court lacks jurisdiction. Under these circumstances, it is appropriate to allow Plaintiff limited jurisdictional discovery to develop facts showing that the Court has jurisdiction. *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 811 (S.D.N.Y.), *aff'd*, 538 F.3d 71 (2d Cir. 2008), *and* 714 F.3d 118 (2d Cir. 2013) ("In evaluating jurisdictional motions, district courts enjoy broad discretion in deciding whether to order discovery."). This discovery is limited to the circumstances concerning Wells Fargo's apparent decision to direct IOB to remit payment to its New York bank account, IOB's acceptance of that decision, and the four payments that IOB remitted in connection with its obligations as collecting bank for Agson. *See APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) ("A district court retains

---

[9] The Court, however, denies the motion to dismiss for lack of jurisdiction without prejudice to renewal after the close of jurisdictional discovery.

considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." (internal quotation marks and citations omitted)).

Because the Court finds that Defendant has presented a potentially meritorious defense that the Court lacks jurisdiction over IOB, the Court does not examine whether the return of the bills of lading represents an independent meritorious defense. *Cf. Fed. Deposit Ins. Corp. v. O'Connor*, 2008 WL 88294, at *2 (S.D.N.Y. Jan. 3, 2008), *on reconsideration*, 2008 WL 2557426 (S.D.N.Y. June 26, 2008) ("[Defendant] need not assert a meritorious defense if the judgment itself was void for lack of jurisdiction."); *KAO HWA Shipping Co., S.A. v. China Steel Corp.*, 816 F. Supp. 910, 913 (S.D.N.Y. 1993) ("A judgment is void and subject to vacatur if the court lacks either subject matter jurisdiction or personal jurisdiction, regardless of whether a meritorious defense exists.").

## III.   Prejudice

"Because relief from a default entry . . . essentially is a matter of fairness and judicial discretion, the single most persuasive reason for denying a Rule 55(c) motion is prejudice to the nondefaulting party caused by reopening the action."  10A Fed. Prac. & Proc. Civ. § 2699 (footnote omitted).  "[D]elay alone is not a sufficient basis for establishing prejudice."  *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983).  "Some delay is inevitable when a motion to vacate a default judgment is granted . . . [and so] something more is needed.  For example, delay 'may thwart plaintiff's recovery or remedy.  It also may result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion.'"  *Green*, 420 F.3d at 110 (quoting 10A Fed. Practice & Procedure: Civil § 2699 (3d ed.1998)).  "Accordingly, in determining whether a plaintiff has suffered prejudice, courts consider 'the effect of the delay caused by the defendant's default.'"  *Manzanares v. Your Favorite Auto Repair & Diagnostic*

*Center, Inc.*, 2020 WL 6390162, at *8 (E.D.N.Y. Nov. 8, 2020) (quoting *Swarna v. Al-Awadi*, 622 F.3d 123, 142 (2d Cir. 2010)).

Plaintiff contends that it will suffer prejudice because (1) the delay has diminished the value of its almonds, which are perishable, and has harmed its ability to trace the almonds; (2) its allegations are based on fraudulent conduct by IOB and Agson; and (3) the delay will give IOB and Agson an opportunity to conceal or transfer payments that may have been sent with respect to the almonds.  Dkt. No. 25 at 16.  None of these arguments represent cognizable prejudice to Plaintiff on the motion to vacate the entry of default in this action.  Plaintiff is suing IOB for the bargained-for value of the almonds, not for specific performance and return of the almonds.  *See* Dkt. No. 1 at 8–9 (prayer for relief).  Similarly, Plaintiff has traced the almonds to Faribadab, India, *see* Greenwald Decl. ¶ 9, and need trace the almonds no further; the relevant question in this litigation turns upon whether the almonds left the port of Nhava Sheva, India, after the impermissible presentation of the bills of lading.  The Complaint also does not allege fraud by IOB and Agson and thus the potential for loss of evidence of fraud has little bearing on this lawsuit.  Finally, Plaintiff does not argue that IOB is judgment proof, so IOB's ability to conceal or transfer payments will not prejudice Plaintiff.

Plaintiff also argues that it will suffer prejudice because it has "expended significant time, money, and resources in attempting to move this case forward in spite of IOB's default."  Dkt. No. 25 at 15.  This prejudice is cognizable; Plaintiff has unquestionably been prejudiced by being forced by IOB's nonappearance to move for entry of default and to prosecute this action without an opposing party.  However, the Court can redress this prejudice by means other than entering default judgment:  It can, and does, order that IOB reimburse Plaintiff the reasonable attorneys' fees and costs it incurred by moving for the entry of default and for default judgment.

*See Hong*, 2021 WL 6064101, at *5 n.3; *cf. Powerserve Int'l, Inc.*, 239 F.3d at 515 (holding that "[i]n determining whether to exercise its discretion to set aside a default, . . . a district court has inherent power to impose a reasonable condition on the vacatur in order to avoid undue prejudice to the opposing party" and affirming district court's imposition of a bond).

## IV.    Balancing

Weighing the factors, setting aside the Clerk's entry of default is appropriate here.  As explained above, Defendant has presented a potentially meritorious defense—that personal jurisdiction does not lie under New York's long-arm statute—and Plaintiff will not suffer prejudice from vacatur.  To the degree that Defendant's default was willful, that willfulness does not tip the scales in favor of entry of default judgment, in light of the Second Circuit's clear "preference that litigation disputes be resolved on the merits, not by default," *Cody*, 59 F.3d at 15.  Resolving all doubts in favor of Defendant, as this Court must, *see Green*, 420 F.3d at 104, the Court finds that there is good cause under Rule 55(c) to set aside the entry of default.

## CONCLUSION

Plaintiff's motion for default judgment is DENIED.  Defendant's motion to set aside the default is GRANTED, and the entry of default is vacated.  The Court grants Plaintiff's request for limited jurisdictional discovery with respect to personal jurisdiction.  The parties are directed to submit a joint letter on or before April 14, 2023, proposing a discovery schedule to be completed within approximately two months from that date.  Defendant's motion to dismiss for lack of jurisdiction is DENIED without prejudice to renewal within thirty days of the close of jurisdictional discovery.

The Clerk of Court is respectfully directed to close Dkt. Nos. 16, 21, and 33.

SO ORDERED.

Dated: March 28, 2023
     New York, New York

                              LEWIS J. LIMAN
                        United States District Judge